* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the opinion of award. Upon a full review, the Full Commission affirms the Opinion and Award of Deputy Commissioner Phillips, with modifications.
 * * * * * * * * * * *
Deputy Commissioner Phillips' award was based upon her feeling that the Compromise Settlement Agreement entered into by the parties and approved by Deputy Commissioner Robert Harris should be set aside because plaintiff's low IQ rendered her incapable of understanding it.
In plaintiff's Form 33 Request for Hearing, she said:
 "I have a full scale I.Q. of 55. The employer used its superiority and made false statements to me to lure me into signing compromise settlement papers. I now have no job and no workers' compensation benefits. At the time, I did not have an attorney. Now I seek to set the Compromise Settlement Agreement aside."
In their Form 33R Response, defendants said (in part):
 ". . . the Employer did not make false statements to lure her into signing a Final Compromise Settlement Agreement. In that regard, the settlement agreement should not be overturned or set aside as there is no fraud, misrepresentation, undue influence, or mutual mistake in this case."
Upon review, the Full Commission has determined that the Compromise Settlement Agreement should be set aside by reason of misrepresentation, undue influence and fraud in the inducement.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workmen's Compensation Act.
2. All parties have been correctly designated, and there is no question as to misjoinder or non-joinder of parties.
3. An employment relationship existed between plaintiff and General Glass International at the time of injury on December 2, 2002, relevant to this claim.
4. Plaintiff was employed as a box assembler with General Glass on the date of the accident.
5. Plaintiff's average weekly wage was $320.00 yielding in a compensation rate of $213.34.
6. At the time of the accident, The PMA Insurance Group provided workers' compensation insurance coverage for General Glass.
7. This matter involves an injury to plaintiff's left thumb, the compensability of which was accepted by defendants.
 * * * * * * * * * * * EXHIBITS
In addition to the above stipulations, the parties agreed to stipulate to and the Deputy Commissioner received into evidence the following documents:
1. Plaintiff's Answers to Defendants' First Set of Interrogatories and Request for Production of Documents as Stipulated Exhibit 1.
2. Defendants' Responses to Plaintiff's First Set of Interrogatories as Stipulated Exhibit 2.
3. Final Compromise Settlement Agreement dated February 19, 2004 as Stipulated Exhibit 3.
4. An Addendum to the Final Compromise Settlement Agreement as Stipulated Exhibit 4.
5. Order from Deputy Commissioner Robert Harris approving the settlement agreement as Stipulated Exhibit 5.
6. Industrial Commission Forms and Filings as Stipulated Exhibit 6.
7. Plaintiff's medical records as Stipulated Exhibit 7.
 * * * * * * * * * * *
Based upon the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was 46 years old and had a sixth grade education. Plaintiff has been married for 31 years, has a driver's license, owns a car, owns her own home, and has children.
2. Plaintiff first began working when she was sixteen years old. She started working at a company called T S as a ring spinner and remained in that employment for 4 years. After that, plaintiff went to work at K-Mart as a part-time cashier and part-time stocker and remained in that employment for two years when she was laid off.
3. Plaintiff began working for General Glass in January of 2000, and her first job responsibility was to break glass. Plaintiff graduated to the position of glass washer in June of 2002. In September of 2002 she began working as a box maker for General Glass.
4. Plaintiff sustained an injury to her left thumb on December 2, 2002, when she went to pick up a stack of boxes and the boxes fell back, jamming her left thumb.
5. Plaintiff initially presented to Dr. Hall at First Health Family Care in Rockingham on February 4, 2003. Dr. Hall diagnosed a left thumb strain with trigger finger. Dr. Hall later referred plaintiff to an orthopedist.
6. On February 21, 2003, plaintiff presented to Dr. Neil Conti at Pinehurst Surgical Clinic. Dr. Conti also obtained x-rays, which showed no evidence of fracture, dislocation, or arthritis. Dr. Conti injected her left thumb with Celestone and Xylocaine, and prescribed Bextra. Plaintiff continued to have trouble, so Dr. Conti eventually performed a left trigger thumb release at Richmond Memorial Hospital on May 30, 2003.
7. Following the surgery, plaintiff continued to follow up with Dr. Conti, and x-rays obtained on August 8, 2003 showed no evidence of fracture, dislocation, or arthritis. Dr. Conti diagnosed left MCP synovitis of the thumb, and recommended bone scans of both hands. On August 12, 2003, plaintiff underwent a bone scan with non-specific findings. On August 22, 2003, Dr. Conti diagnosed plaintiff with CMC joint degenerative disease and synovitis. He referred plaintiff to Dr. Brenner for further evaluation.
8. Plaintiff presented to Dr. Mark Brenner on September 8, 2003. Dr. Brenner injected the MCP joint with Lidocaine and Celestone. Subsequently, plaintiff continued to follow up with Dr. Brenner, and x-rays of October 21, 2003 revealed a degenerative osteoarthritis at the CMC joint. On October 21, 2003, Dr. Brenner assigned work restrictions of restricted repetitive use of the left hand including limited grasping, fine manipulation, pushing, pulling, wrist bending, vibration, production rate, and duration of activity.
9. On October 27, 2003, plaintiff returned to work with General Glass. When plaintiff returned to work, she continued making boxes. At that time, General Glass's business was beginning to slow down.
10. Joe DeCarro, the general manager, testified at the hearing before the Deputy Commissioner that the production manager, Terry, sent a lady named Judy around the plant to inquire among the employees as to whether they would be interested in taking a voluntary temporary layoff. This occurred within a week or so after plaintiff returned to work. Carol Capel, the Human Resources Director, testified that plaintiff, in general conversation, reported that she was thinking about taking the voluntary temporary layoff and had until the end of the day to decide. At the end of the day, plaintiff reported to DeCarro's office and asked whether General Glass would bring her back if she took the voluntary temporary layoff. DeCarro advised that it was a temporary layoff and when business picked up, they would bring her back. Plaintiff subsequently accepted the voluntary temporary layoff and Carol Capel completed a "Change of Status" report on November 3, 2003.
11. Subsequently, General Glass reduced its shifts from two to one on November 6, 2003. This change was implemented due to a slowdown of business. As of the date of hearing before the Deputy Commissioner in this matter, business had not increased and the plant was still only running one shift.
12. Following the layoff, Carol Capel processed plaintiff's unemployment benefits as part of payroll.
13. On December 18, 2003, plaintiff underwent a CT scan at Richmond Memorial Hospital, which revealed a mild subluxation of the carpometacarpal joint of the left thumb with no acute fracture or arthritis evident. On January 13, 2004, Dr. Conti opined that there was not enough objective evidence to warrant a surgical reconstruction. Therefore, Dr. Brenner opined that plaintiff had reached maximum medical improvement and assigned a 12% permanent partial disability rating to the plaintiff's left hand.
14. In February of 2004, the insurance adjuster in this case, Diane Raiford, negotiated a settlement with plaintiff of $6,000.00.
15. Plaintiff's counsel took the deposition of Ms. Raiford whose deposition and computer case notes were introduced into evidence.
16. Dr. Brenner's original thought was that he would rate plaintiff with a 16% permanent partial disability rating to her thumb. Under the provisions of N.C. Gen. Stat. § 97-31, such a rating to plaintiff's hand would have yielded permanent partial disability compensation due to plaintiff in the amount of $6,826.88. She later learned that her rating was 12%, which would have yielded $5,632.18.
17. Ms. Raiford's note of January 16, 2004, concerning her settlement negotiations with plaintiff are as follows:
 "I spoke with IW (injured worker) about settlement of her claim. I explained to her that this Dr. had rated her thumb not her hand. This is a lot less than what we had discussed before. I offered her $4,000.00 to settle the claim. I explained the amt the rating is worth and offered her more. She said she would talk to her lawyer. I explained to her that $4k is the max authority I have to settle the claim and the atty will not get any more than that and would only take part of her settlement. She said her Dr. told her that she would be getting a 15% rating to the hand. She is going to call the Dr. And verify the rating and call me back."
18. The information that Ms. Raiford presented to plaintiff was false and misleading. In her deposition she admitted that she had authority to settle the claim for $7,500.00 ("As an adjuster I had $7,500 in authority from PMA." Tr. P. 24, L. 6-7) yet she represented to the plaintiff that $4,000.00 was her maximum authority. She also told plaintiff that if plaintiff hired an attorney the attorney would not get more than that and would only take part of her settlement. This statement, too, was false and misleading. A knowledgeable workers' compensation attorney would have told plaintiff that she had an election between continuing temporary total disability and her rating and that the continuing temporary total disability would likely be higher than the rating. The statement that the attorney would take part of her settlement was also false and misleading. The Industrial Commission must approve all attorney fees. The usual practice when an unrepresented plaintiff has negotiated a money settlement is to base the attorney's contingent fee on any settlement amount negotiated by the attorney above the amount previously negotiated by his client.
19. These statements by the insurance adjuster had the effect of depriving plaintiff of competent legal advice and misleading plaintiff to believe that the amount offered by the adjuster was the maximum she had the authority to offer.
20. Ms. Raiford's note of January 30, 2004, concerning her settlement negotiations with plaintiff are as follows:
 "I spoke to the IW (injured worker) about the rating that we have received, advising her that the rating is worth 24 wks × $213.34 = $5120.16. I offered her $5700 to settle full and final. She asked if the insured was going to bring her back to work. I told her that when I talked to them, they were not going to bring any one back for a while. I did offer her $7400 if her rating was in fact 16% to the hand. Now that the rating is 12% to the hand I offered her $5700.00. She said she liked the first offer better. I told her I could not do that since the rating is lower. She is going to think about it this weekend and call me on Monday."
21. The fact that plaintiff asked the insurance adjuster whether the employer was going to bring her back to work indicated to the adjuster that a recall after the voluntary layoff was important to the plaintiff. Yet the adjuster misled plaintiff in telling her that "they were not going to bring any one back for a while." (Emphasis supplied.) This indicated falsely that there would be a recall. Plaintiff relied upon this misrepresentation to her detriment.
22. Defendants prepared a Final Compromise Settlement Agreement and the agreement was approved on March 23, 2004, by Special Deputy Commissioner Robert Harris. On March 23, 2004, Diane Raiford also submitted a Form 28B to the Industrial Commission which indicated that temporary total disability payments were paid from May 30, 2003, until July 3, 2003, and from October 1, 2003, until November 25, 2003.
23. Plaintiff received unemployment benefits in the amount of approximately $173.00 per week following her layoff. She continued receiving these benefits until June of 2004. Plaintiff then received a letter from the Employment Security Commission indicating that they were transferring her to a permanent layoff status. At that time, plaintiff contacted General Glass to set up a time to meet with Joe DeCarro.
24. When plaintiff met with Joe DeCarro he told her that she was laid off permanently.
25. On August 3, 2004, plaintiff, by and through counsel, requested a hearing before the Deputy Commissioner, seeking to overturn the clincher agreement.
26. Dr. Joseph Apollo, a psychologist, performed an assessment of plaintiff's learning capabilities and cognitive abilities. Dr. Apollo testified that he performed a clinical interview and administered a Wechsler Adult Intelligence Scale Test. Based on this evaluation, Dr. Apollo opined, and the Full Commission finds as fact, that plaintiff has a mild level of mental retardation. Dr. Apollo explained that Plaintiff had an IQ score of 67. An IQ score of 70 or below is considered to be consistent with mental retardation.
27. The Full Commission finds that although plaintiff has a driver's license, owns a car, and has children, based upon Dr. Apollo's assessment concurred in by the Full Commission, plaintiff lacked the cognitive functioning ability to determine whether the insurance adjuster was making false and misleading statements.
28. While plaintiff had returned to work for General Glass, she was working under restrictions imposed by her physician when she accepted a voluntary layoff under circumstances where she was wrongfully led to believe that she would be called back to work. Defendants presented no evidence that plaintiff's disability had ended or that she was unable to earn any wages given her low IQ and previous work history. Under these circumstances plaintiff was entitled to continuing temporary total disability subject to further orders of the Industrial Commission and defendants were entitled to credit for unemployment compensation received by plaintiff.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. A compromise settlement agreement may be set aside by the Industrial Commission upon a finding of fraud, misrepresentation, undue influence, or mutual mistake. N.C. Gen. Stat. § 97-17;Holden v. Boone, 153 N.C. App. 254, 569 S.E.2d 711 (2002).
2. Under the circumstances of this case, the compromise settlement agreement was procured by the insurance adjuster through fraud, misrepresentation and undue influence. Accordingly, it must be set aside. N.C. Gen. Stat. § 97-17;Holden v. Boone, 153 N.C. App. 254, 569 S.E.2d 711 (2002).
3. Plaintiff is entitled to continuing temporary total disability from the date she accepted the layoff subject to further orders of the Industrial Commission. N.C. Gen. Stat. §97-29.
4. Defendants are entitled to credit for unemployment compensation received by plaintiff. N.C. Gen. Stat. § 97-43.
5. Defendants are entitled to credit against continuing temporary total disability for the $6,000.00 they paid to plaintiff pursuant to the settlement agreement herein set aside.
 * * * * * * * * * * *
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. The compromise settlement agreement having been procured through fraud, misrepresentation and undue influence is hereby set aside.
2. Subject to the attorney's fees set forth below, defendant shall pay to plaintiff continuing temporary total compensation of $213.34 per week from the date of plaintiff's layoff. Defendants shall pay such compensation as has accrued in a lump sum and shall thereafter pay benefits weekly.
3. Defendants shall pay one fourth of the lump sum referred to in paragraph 2 of this Award directly to plaintiff's attorney without offset or credit. Defendant shall thereafter send every fourth check directly to plaintiff's attorney. Defendants may offset against plaintiff's 75% lump sum 75% of unemployment compensation received by plaintiff and 75% of the $6,000.00 settlement money received by plaintiff.
4. Defendants shall bear the costs.
This 26th day of September 2006.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER